**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **CRAIG KULIGOWSKI,** | CASE NO. 3:24 CV 626 |
| Plaintiff, | |
| v. | JUDGE JAMES R. KNEPP II |
| **UNIVERSITY OF TOLEDO, et al.,** | |
| Defendants. | **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Currently pending before the Court are (1) Defendants University of Toledo ("UT") and Bethany Ziviski's Motion for Summary Judgment (Doc. 54) and (2) Plaintiff Craig Kuligowski's Motion for Partial Summary Judgment (Doc. 53).

Jurisdiction is proper under 28 U.S.C. § 1331. For the reasons set forth below, the Court grants Defendants' Motion and denies Plaintiff's Motion.

## BACKGROUND

UT Athletic Department Overview

Director of Athletics Bryan Blair was hired by UT in May 2022. (Blair Decl., Doc. 54-2, at 1). He is responsible for, *inter alia*, hiring head coaches for all sports teams, but is not involved in and does not make hiring decisions related to assistant coaches or other coaching staff. *Id.* at 1-2. In consultation with UT's Human Resources ("HR") Department, Blair makes non-performance-based termination decisions for coaches, including terminations based on misconduct or violation of UT's policies and procedures. *Id.* at 2.

Head UT Football Coach Jason Candle hired Plaintiff (who is Caucasian) as Assistant Head Coach, Co-Defensive Coordinator, and Defensive Line Coach in February 2020. (Candle

Decl., Doc. 54-6, at 1-2). As head coach, Candle has sole authority to hire football department coaches and to terminate such coaches for performance-based reasons. *Id.* at 1.

The parties largely do not dispute underlying facts at issue, but disagree about the import of those facts.

Original Complaint

In September 2022, UT's Title IX Office received reports of an incident of potential sexual discrimination and harassment by Plaintiff. *See* Doc. 54-5, at 20-23 (reports from Brian Jones, Senior Associate Athletic Director; Sarah Long, Associate Lecturer; and Adam Barta, Associate Athletic Trainer).[1] The reports alleged Plaintiff had made a comment to a female Graduate Student Assistant Athletic Trainer (hereinafter "Jane Doe"). *See id.* The University's Title IX Coordinator contacted Jane Doe, but she declined to proceed with a Title IX investigation. (Burton Decl., Doc. 54-5, at 3).

HR Policies and Investigation

On October 3, 2022, the complaint was forwarded to HR Compliance for mandatory investigation under UT's Nondiscrimination Policy (3364-50-02). (Burton Decl., Doc. 54-5, at 3); *see also* Doc. 54-5, at 8-14 (policy). The Nondiscrimination Policy provides:

> The University of Toledo does not discriminate on the basis of race, color, religion, sex, age, national origin, ancestry, sexual orientation, gender identity and expression, military or veteran status, the presence of a disability, genetic information, familial status, political affiliation, or participation in protected activities in its provision of employment and educational opportunities. Discrimination, including discriminatory harassment, on any of those bases is strictly prohibited.

---

1. Complaints that involve allegations of sexual misconduct or sex discrimination originate in UT's Title IX Office and the Human Resources ("HR") Department does not investigate such complaints. (Burton Decl., Doc. 54-5, at 2). Such complaints which "do not meet the Title IX Office's standard for review" are then forwarded to the HR Compliance office for review and investigation. *Id.* HR Compliance is required to investigate all complaints determined to fall within the scope of the Nondiscrimination Policy. *Id.*

(Doc. 54-5, at 8).

Jennifer Burton, then an HR Compliance Specialist, assigned Stacy Latta as the lead investigator and assisted in the investigation. (Burton Decl., Doc. 54-5, at 3); *see also* Latta Depo., Doc. 43, at 33.[2] On October 10, 2022, Burton contacted Jane Doe by email to notify her of the investigation and schedule an interview. (Doc. 54-5, at 98). During a subsequent interview, Jane Doe reported Plaintiff made a comment that she was "wearing earrings and had her fancy pants on," which made her uncomfortable. *Id.* at 67. She reported the comment to others. *Id.* Jane Doe also referenced prior incidents in which Plaintiff had made comments that made her uncomfortable. *Id.* Burton also interviewed Barta and Long on October 17, 2022. (Burton Decl., Doc. 54-5, at 4).

On November 4, 2022, Burton contacted Plaintiff by email to notify him of the investigation and request an interview. *Id.* at 113. She further attached the University's Nondiscrimination, Non-retaliation, and Standards of Conduct Policies. *See id.* at 113-57. The attached letter described the investigation process. *Id.* at 114; *see also* Doc. 37-5. During the interview on November 9 (in which both Burton and Latta participated and Plaintiff's advisor/advocate Ceana Glover attended), Plaintiff admitted to making the "fancy pants" comment but asserted he did not intend it to be sexual or offensive. (Plaintiff Depo., Doc. 37, at

2. The Complainant and witnesses are typically interviewed prior to a Respondent being notified of an investigation to reduce the risk of retaliation. (Burton Decl., Doc. 54-5, at 4). Following a completed investigation, HR Compliance issues a written explanation of its findings. *Id.* HR Compliance applies a preponderance of the evidence standard in investigating and resolving such complaints. *See id.* at 2; *id.* at 12 (Nondiscrimination Policy investigation procedures). Upon a finding of inappropriate conduct, HR Compliance refers the matter to HR and to the supervisor with authority over the individual. *Id.* at 13. The supervisor is then responsible for determining appropriate discipline. *Id.* A Respondent is permitted to bring one non-attorney witness advisor to an HR Compliance interview, but that person is not permitted to speak during the interview. *See id.* at 4, 12.

90) ("I had walked quickly by one of our student athletes who was talking with a student trainer. And I said, 'Oh, you have your fancy pants on.' Because we're all, like, during the - - we would practice at 6:00 a.m. and everybody was not looking very clean and tidy at 6:00 a.m. in the morning."); *see also* Doc. 54-5, at 28 (interview notes). During that interview, Plaintiff indicated Barta subsequently informed him it would be best if he did not speak to the female athletic trainers. (Doc. 45-5, at 29). At the end of the interview, Latta reminded Plaintiff of the University's Non-retaliation Policy. *See id.* at 30.

Following completion of these interviews, Latta began to prepare a written report. (Burton Decl., Doc. 54-5, at 4). Before that report was complete, HR received a second complaint regarding an incident between Plaintiff and Jane Doe. *See* Latta Depo., Doc. 43, at 37.

Retaliation Complaint

On December 16, 2022, UT's football team and staff were in Florida for a postseason bowl game. According to Plaintiff (and witnesses), he initiated a conversation with Jane Doe (who sat down near him). *See* Kuligowski Depo., Doc. 37, at 158-61; *see id.* at 161 (Q: "And you make the first comment to Jane Doe. Correct?" A: "Correct."); *id.* at 169 (Plaintiff's testimony that he "spoke first" to Jane Doe and that he "felt that she had been lying the whole time"). Plaintiff said something like, "[i]f my wife knew how close you were sitting next to me, she'd want to kill you." *Id.* at 161-62. Plaintiff explained that this was a "tension filled joke" similar to saying "if I eat all the potato chips, my wife's going to kill me." *Id.* at 162; *see also* Doc. 53-2, at 11 (investigative report). Plaintiff testified Jane Doe responded with something like "Do you think I wanted any of this to happen?" (Kuligowski Depo., Doc. 37, at 162). Plaintiff told Jane Doe that HR told him she was the one to pursue the complaint. *Id.* at 163. He testified that this point, Plaintiff "got very upset," "walked off," and "looked like a two-year-old child if you took

their sucker away." *Id.* Plaintiff testified he made the comment because "it was a very tough situation that [he] felt like [he] totally was bushwhacked and put through the wringer." *Id.* at 161.

The following morning, Blair suspended Plaintiff and sent him home after consulting with individuals from the University's HR and Title IX Departments. (Blair Depo., Doc. 41, at 28-29). Blair did not consult with Candle, the head football coach, before making this decision. *See id.* at 31 ("I informed [Candle]. I didn't ask for his opinion."); (Candle Depo., Doc. 39, at 28-29). Nor did Blair ask Plaintiff to explain; Plaintiff recalls Blair telling him, "I don't want to hear anything you have to say . . . [y]ou're done. You're going home." (Plaintiff Depo., Doc. 37, at 26).

The University received three reports of this interaction the following day. *See* Doc. 54-5, at 32-34 (reports from Blair, Jones, and Barta). Jane Doe additionally submitted her own complaint on December 19. *Id.* at 92.

These complaints were forwarded to HR Compliance. It was investigated under the University's Non-retaliation Policy (3364-15-04). *See* Burton Decl., Doc. 54-5, at 4-5. That policy defined retaliation as "[d]isciplinary or adverse action taken against an individual because she or he has made a protected disclosure or has participated in an investigation, proceeding, or hearing involving a protected disclosure. *Id.* at 18. Although the Non-retaliation Policy itself does not define "adverse action," the Nondiscrimination Policy includes a description of "adverse action" within its definition of retaliation:

> *Retaliation*: Adverse action taken against an individual because the individual has engaged in a protected activity (such as filing a discrimination complaint or participating in an investigation of a violation of law or policy). The adverse action can be tangible (such as the giving of a lower grade or unjustified discipline) or intangible (such as the making of verbal threats).

(Doc. 54-5, at 10). It is undisputed that Plaintiff had no supervisory authority over Jane Doe. (Candle Depo., Doc. 39, at 35); (Blair Depo., Doc. 41, at 35-36); (Latta Depo., Doc. 43, at 44).

Latta interviewed Jane Doe by phone on December 19, 2022. *See* Doc. 53-2, at 7-8; Doc. 54-5, at 50 (interview notes). Latta and Burton further interviewed Barta on December 19, 2022, as well as Assistant Athletic Trainer Kengo Sugimoto, Assistant Athletic Trainer Aaron Wass, and Wass's wife on December 20, 2026. (Doc. 53-2, at 13-16); *see also* Doc. 54-5, at 35-38, 60-62) (interview notes). After notifying him of the new investigation in a letter dated December 19, 2022 (Doc. 54-5, at 43), Latta and Burton interviewed Plaintiff in person. *See* Doc. 53-2, at 10 (investigation report stating the interview occurred December 21, 2022); Doc. 54-5, at 54-55 (interview notes dated December 20, 2022). Plaintiff recalls this interview lasted approximately 30 minutes; he did not believe he was allowed to share his "full side of the story" and further asserted the written report did not summarize his full testimony. (Kuligowski Depo., Doc. 37, at 26-27). The interview notes state Plaintiff recalled making a comment such as "if my wife knew you were near me" and then something with the word "kill" in it. (Doc. 54-5, at 54).

Latta testified she prioritized the investigation of the retaliation complaint for multiple reasons: (1) the "severity of the allegation" with it happening while there was already an ongoing investigation and the individuals were traveling; and (2) because Plaintiff had been placed on administrative leave. (Latta Depo., Doc. 43, at 49-50). She also testified that mid-to-late December after students leave campus is a time when work can be completed more quickly because there are typically not new complaints coming in. *Id.* at 50. Latta noted the speed of the investigation was due to this availability, the fact that she had already completed the sexual harassment investigation, and that all of the witnesses to the retaliation complaint were available quickly. *Id.* at 50-51.

Investigative Report & Findings

The Report of Investigation was issued on December 22, 2022. (Doc. 53-2). It summarized the investigation of both complaints, and, based on the preponderance of the evidence standard, found: (1) there was insufficient evidence to determine Plaintiff's original conduct in September 2022 violated the University's Nondiscrimination Policy, but (2) (based on the same standard), there *was* sufficient evidence to determine Plaintiff violated the Non-retaliation Policy based on his December 2022 conduct. *See* Doc. 53-2, at 21-22. Specifically, the Report found there was sufficient evidence Plaintiff "engaged in retaliation toward [Jane Doe] when he approached her and discussed the ongoing investigation." *Id.* The Report found these actions "were adverse toward [Jane Doe] and were as a result of her reporting [Plaintiff's] conduct to her supervisor and a faculty member, and her participation in the investigation." *Id.* at 21. The matter was therefore "referred to Human Resources and the Department of Athletics for review and next steps." *Id.* at 22.

Termination

Blair made the decision to terminate Plaintiff in consultation with Jason Beck in HR. (Blair Depo., Doc. 41, at 41); *see also* Doc. 54-2, at 4 ("After reviewing the Report of Investigation and consulting with Jason Beck, Director of Human Resources Academic Operations, I made the decision to terminate [Plaintiff] based on a finding that his conduct violated the University's Nonretaliation Policy."). In his deposition, Blair did not recall who initially suggested termination. *See id.* Beck drafted the separation letter and submitted it to Ziviski. (Beck Decl., Doc. 54-3, at 2).

UT terminated Plaintiff's employment in a letter signed by Ziviski dated January 14, 2023. (Doc. 57-18).[3] It stated Plaintiff was terminated "[f]ollowing an administrative investigation, and based on substantial evidence" that Plaintiff had "committed a significant and/or intentional violation of the University of Toledo Non-Retaliation policy (3364-15-04), and Standard of Conduct policy (2264-25-01). Therefore, we are terminating your agreement with the University for cause." *Id.*[4]

Toledo Blade Article

On January 23, 2023, a reporter with the Toledo Blade submitted a public records request to UT for Plaintiff's "employment contract – and amendments." (Cunningham Decl., Doc. 54-4, at 1-2); Doc. 54-4, at 4 (emailed records request). UT responded to the public records request the same day by providing Plaintiff's Employment Agreement and First Amendment to that Employment Agreement. *See* Doc. 54-4, at 4; *id.* at 6-25 (Employment Agreement documents). The reporter then followed up, requesting "any and all documents in [Plaintiff's] personnel file." (Cunningham Decl., Doc. 54-4, at 2); *see also id.* at 27 (email follow up). UT provided a redacted copy of Plaintiff's personnel file to the reporter on January 25, 2023. (Cunningham Decl., Doc. 54-4, at 2-3); *see also id.* at 29-110 (redacted personnel file). This did not include the

---

3. Ziviski oversaw the HR department during the 2022-2023 school year. (Ziviski Depo., Doc. 38, at 15). In that role, she signed off on staff separations and received updates on ongoing HR investigations. *Id.* at 19, 33.

4. The Standards of Conduct Policy (3364-25-01) provided, *inter alia*:

> The expectation is that all employees are held to the highest standards of conduct in all areas related to their employment. Inappropriate conduct of any kind, including but not limited to, disruptive, discourteous, disrespectful, abusive behavior, substandard quality of work, theft, falsifying records, failure to properly record time worked or any other behavior deemed inappropriate will be subject to disciplinary action based on the circumstances of the situation.

(Doc. 54-5, at 124). The Policy provided that failure to follow it "may result in discipline up to and including termination." *Id.*

investigative report. The investigative report is not maintained in Plaintiff's personnel file. (Burton Decl., Doc. 54-5, at 5).

On January 25, 2023 (eleven days after Plaintiff's termination), the Toledo Blade published an article about Plaintiff's firing entitled: "Briggs: Here's why Toledo D-line coach Craig Kuligowski got sent home from bowl game and fired." (Doc. 57-21). The article said the Blade obtained a copy of Plaintiff's termination letter, which stated Plaintiff had "committed a significant and/or intentional violation" of UT's Non-retaliation and standards of conduct policies. *Id.* at 2. It noted Plaintiff's personnel file "cited no further details" and Athletic Director Blair said: "He's no longer employed here as of January 14, and we generally don't comment on personnel matters beyond that." *Id.* The article then stated that reporters had "snoop[ed] around" and found:

> [A]ccording to three people familiar with the situation, the termination stems from an incident during Toledo's trip to Florida for the Boca Raton Bowl last month.
>
> [Plaintiff] was drinking in the hospitality suite one night at the Boca Raton Marriott at Boca Center, sources said, when he spotted and verbally harassed a female UT staffer who earlier in the year had reported him for allegedly making an inappropriate comment. (There is no record of the previous allegation in the personnel file.)

*Id.* The article does not identify the three individuals, and in response to an interrogatory connected to this suit, Defendants stated they were not aware of the identity of the "three people familiar" cited in the article. (Doc. 57-22, at 4-5). Candle, Beck, Burton, Blair, and Ziviski all assert they did not comment to the Toledo Blade and do not know the identity of the referenced individuals. (Candle Decl., Doc. 54-6, at 3); (Beck Decl., Doc. 54-3, at 3); (Burton Decl., Doc. 54-5, at 6); (Blair Del., Doc. 54-2, at 4); (Ziviski Decl., Doc. 54-1, at 3). Nor does Plaintiff know the identity of the unidentified individuals, but believes "those three sources can only come from the athletic department because those were the only people that knew what was going on in the . .

. hospitality room, throughout the investigation. Or it had to be somebody from HR. Somebody from HR could have informed the Blade." (Plaintiff Depo., Doc. 37, at 183).

Reorganization of Coaching Staff

Following Plaintiff's termination, head coach Candle avers he "did not hire a replacement" to fill Plaintiff's role and that football staffing is not "one-in-one-out." (Candle Decl., Doc. 54-6, at 2). He states he "reorganize[d] responsibilities of coaching staff" after Plaintiff's departure. *Id.* Specifically, Candle eliminated Plaintiff's former job title of Assistant Head Coach, and Ross Watson (who is also Caucasian) took over Plaintiff's job duties as Co-Defensive Coordinator. *Id.* at 1-2.[5]

Candle also hired Larry Knight (who is Black)[6] as a Defensive Line Coach, but asserts he "did not hire Knight as a replacement for [Plaintiff]" as "Knight was solely responsible for coaching the defensive line" and "did not perform the duties or hold the titles of Assistant Head Coach or Co-Defensive Coordinator." *Id.* at 3.[7] Plaintiff's remaining job responsibilities "were

---

5. Watson previously also served as Special Teams Coordinator; Candle hired Stanton Weber to assume the Special Teams Coordinator duties after Watson took over the Co-Defensive Coordinator position. (Candle Decl., Doc. 54-6, at 3). Weber is Caucasian. (Candle Depo., Doc. 39, at 38).

6. Plaintiff cites his attached Exhibit W seemingly as support for his assertion that Knight is Black. *See* Doc. 57, at 23. This Exhibit consists of purported photographs for Knight and Plaintiff. *See* Doc. 57-23. Defendants object to consideration of this exhibit as something not produced in discovery, unauthenticated, and "likely inadmissible in a different form as well." (Doc. 61, at 3). The Court finds it unnecessary to resolve this dispute or consult the exhibit for this proposition as there appears to be no dispute that Knight is Black. *See* Candle Depo., Doc. 39, at 37 (Candle's testimony that Knight is African American).

7. Candle testified:

> Larry Knight's responsibilities and qualifications did not match that of what [Plaintiff's] were. So when we lost [Plaintiff], the assistant head coach title, the co-defensive coordinator title, who I hired to bring on, he was not qualified to do the job at that capacity, nor was he paid the same amount of salary that [Plaintiff] was. He was just hired to coach the defensive line, and the other responsibilities were divvied up between the staff and - - and so were the dollars that were left over from [Plaintiff's] salary.

divided between coaching staff, along with [his] remaining salary." *Id.* When asked whether he discussed the hiring of Knight or Weber with Blair, Candle responded, "Yeah. . . . I mean that - - comes up in casual conversation. How are we doing with the staff? What's that look like? Who we - - who we interviewed? Who are we hiring? Going through a pool of candidates and just - - I felt like that Larry [Knight] was our best guy, and Stanton [Weber] was the best guy to do the special teams." (Candle Depo., Doc. 39, at 38).

<u>EEOC Complaint</u>

On June 13, 2023, Plaintiff filed a charge of discrimination with the EEOC alleging race and age discrimination; he received a Notice of Right to Sue on January 16, 2024. (Docs. 37-13, 37-14).

<u>Request for Name Clearing Hearing</u>

The instant case was originally filed on April 5, 2024. (Doc. 1). Ziviski moved to dismiss on May 20, 2024, in part arguing Plaintiff's due process name-clearing hearing claim failed because he had not requested such a hearing. (Doc. 8).

Plaintiff requested a name-clearing hearing on June 17, 2024. (Doc. 23-2, at 17); (Doc. 31, at 19.[8]

On November 26, 2024, the Court dismissed Plaintiff's due process claim without prejudice. (Doc. 18).

The University denied Plaintiff's request for a name-clearing hearing on December 20, 2024. *See* Doc. 31, at 19; *see also* Doc. 53-6, at 2 (July 25, 2025, letter stating that a representative for UT in conjunction with counsel "made the decision to deny Plaintiff['s] . . .

---

(Candle Depo., Doc. 39, at 36). Knight was paid $110,000. (Candle Decl., Doc. 54-6, at 3). Plaintiff was paid an annual base salary of $162,786. (Candle Depo., Doc. 39, at 22).

8. All parties agree this request was made, but the Court has not been provided the contents of the request.

request for a name-clearing hearing" as untimely because "Plaintiff did not request a name clearing hearing prior to filing the above-captioned lawsuit").

With leave of Court, Plaintiff subsequently filed an Amended Complaint reasserting the claim. *See* Non-document entry dated March 21, 2025 (granting motion for leave to amend); Doc. 23-2, at 18-20 (Amended Complaint).

<u>Diversity, Equity, and Inclusion Initiative at UT</u>

Malaika Bell, then-Director for the Office of Diversity, Equity, and Inclusion ("DEI") at UT testified that such office was established in 2015. (Bell Depo., Doc. 57-24, at 11).[9] Prior to 2023, the University maintained a strategic plan for diversity, equity, and inclusion. *Id.* at 12. As part of these initiatives, the University had a goal of recruiting and retaining underrepresented minorities. *Id.* at 30-31. It further provided related training. *See*, e.g., Docs. 57-3 to 57-7. Candle recalled generally there were many trainings on various topics, including DEI. *See* Candle Depo., Doc. 39, at 44 ("Whether that's CPR, whether it's DEI, whether it's, you know, golf cart

9. Plaintiff filed excerpts of Bell's deposition. *See* Doc. 57-24. The Court cites the deposition page number rather than the ECF page number for clarity. Defendants object to the Court's consideration of this exhibit because (1) it contains excerpts rather than the full transcript, and (2) it lacks the court reporter's certificate and is thus unauthenticated. (Doc. 61, at 3). Defendants cite no specific rule requiring a full deposition transcript be filed and deposition excerpts are commonplace. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("We do not read Rule 56(c) to prohibit filing only part of a deposition.") Defendants are correct, however, that "[t]o authenticate a deposition excerpt, a party should include the cover sheet . . . and the court reporter's certificate." *Id.*; *see also* See Fed. R. Civ. P. 30(f) (requiring that depositions are signed, sworn by the deponent, and certified by a court reporter); *see also Orr v. Bank of Am.*, 285 F.3d 764, 774 (9th Cir. 2002) (holding that deposition transcript excerpts submitted without the names of the deponent or the action and without the court reporter's certification are not authenticated and thus not admissible for consideration on summary judgment). However, because "Rule 56 no longer draws a clear distinction between authenticated and unauthenticated evidence for purposes of summary judgment," *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017), and because Defendants do not expressly dispute the underlying accuracy and authenticity of the deposition excerpts, the Court will consider them.

training. These come up all the time.").[10] But Candle did not recall the specifics of any such training. *Id.*at 45. Blair denied familiarity with DEI initiatives at UT and did not recall any DEI trainings. (Blair Depo., Doc. 41, at 60). He recalled only interacting with the head of DEI during president cabinet meetings. *Id.* at 60-61. Blair also testified he never prepared any materials or performed any training for the athletic department on DEI. *Id.* at 76.

In his June 2022 performance evaluation, Plaintiff, like other UT employees at the time, was rated in a performance evaluation on his "commitment to diversity and inclusion." (Doc. 57-100). He was rated a 3 out of 5, defined as "meets". *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing' – that is, pointing out to the district court

---

10. Plaintiff also submits what purports to be a screenshot of a UT Athletics webpage from January 27, 2023, regarding diversity, equity and inclusion. (Doc. 57-9). Defendants object to the consideration thereof because the document was not produced during discovery and when Blair was asked about it in his deposition, he stated he did not recognize it. (Blair Depo., Doc. 41, at 62). The parties agree the page is no longer available. *See* Doc. 61, at 3; Doc. 57, at 11 n.2. The Court finds Plaintiff has not established the exhibit could be produced in admissible form at trial and therefore will not consider it. *See* Fed. R. Civ. P. 56(c). Moreover, even if the Court did consider the exhibit, it would not change the analysis herein.

– that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

**DISCUSSION**

Defendants contend they are entitled to summary judgment on all of Plaintiff's claims. *See* Doc. 54. Plaintiff opposes and separately argues he is affirmatively entitled to summary judgment on Count IV of the Complaint. (Doc. 53, 57). For the reasons set forth below, the Court finds Defendants entitled to summary judgment.

Count IV – Due Process

Both parties seek judgment in their favor on Count IV of Plaintiff's Amended Complaint. *See* Doc. 53, Doc. 54, at 32-41. Count IV alleges a due process clause violation against Ziviski, in her official capacity as Executive Director of HR. (Doc. 23-2, at 16-18). In this Count Plaintiff alleges "Defendants" deprived him of a liberty interest "by transmitting the false charges to the TOLEDO BLADE in connection with his termination" and denied him due process when they subsequently denied his request for a name-clearing hearing. *Id.* at 16-17. For relief on this Count, he seeks:

> (1) A permanent injunction prohibiting [Ziviski] or any agent of the University from making or maintaining any notation on [Plaintiff's] employment record relating to the investigation of the complainant's complaint at the University and from taking any further action depriving him of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated [Plaintiff's] right to due process.

*Id.* at 18.

The Fourteenth Amendment forbids state actors from depriving individuals of life, liberty or property without due process of law. *See Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir. 1993); *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972); *Joelson v. United States*, 86 F.3d 1413, 1420 (6th Cir. 1996) ("To sustain a procedural due process claim, a plaintiff must first demonstrate the existence of a protected liberty or property interest."). Except in exceptional circumstances not applicable here, a person has a right to a hearing before he is deprived of either a liberty or property interest. *Roth*, 408 U.S. at 570 n.7. The Fourteenth Amendment protects a person's liberty interest when his "good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see Crosby v. Univ. of Ky.*, 863 F.3d 545, 555 (6th Cir. 2017). "That liberty interest is impugned when a state actor stigmatizes an individual by means of voluntary, public dissemination of false information about the individual," damaging the individual's reputation. *Crosby*, 863 F.3d at 555 (citation modified). To prove that a statement was stigmatizing, a plaintiff must establish the statement either imposed a "moral stigma," capable of damaging his standing in the community, or that the statement prevented him from taking "advantage of other employment opportunities." *Id.* at 556 (quoting *Roth*, 408 U.S. at 573). Five elements are required for such a claim:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment. . . . Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty, or malfeasance. . . . Third, the stigmatizing statements or charges must be made public. Fourth, the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002) (quoting *Brown v. City of Niota*, 214 F.3d 718, 722-23 (6th Cir. 2000)).

If the plaintiff can demonstrate those elements, he is entitled to a name-clearing hearing, which functions as "a post-removal opportunity to refute the false charges that led to his removal." *Id.* (internal citation and quotation marks omitted). "It is the denial of the name-clearing hearing that causes the deprivation of the liberty interest without [procedural] due process." *Id.* Therefore, "a plaintiff's failure to request a name-clearing hearing is fatal to a claim alleging a deprivation of a liberty interest without due process." *Quinn*, 293 F.3d at 323. Further, "[t]he point of a name-clearing hearing is *not* to argue over the reasons for termination." *Jennings v. Cnty. of Monroe*, 630 F. App'x 547, 556 (6th Cir. 2015). "Rather, the point is to give the employee the opportunity to argue, 'You made a statement about me that is ruining my reputation, and that statement is not true.'" *Id.*

And it is not the publication of stigmatizing information, but "the denial of the name-clearing hearing that causes the deprivation of the liberty interest without due process." *Brown*, 214 F.3d at 722-23.

Although Plaintiff addresses them together, he rests his claim on three separate allegedly stigmatizing "statements." The Court addresses each in turn.[11]

---

11. The Court finds unavailing Defendants' argument that Ziviski is entitled to dismissal of Count IV because she was not personally involved in the alleged due process violation. Plaintiff brings this claim against Ziviski "in her official capacity as Executive Director of HR." (Doc. 23-2, at 16); *see also* Ziviski Decl., Doc. 54-1, at 2 (stating Ziviski serves as Chief Human Resources Officer). And in this claim, Plaintiff seeks only injunctive and declaratory relief in the form of an order prohibiting anyone at the University from maintaining any notation in his employment record regarding the investigation and declaratory relief in the form of a declaration that his due process rights were violated *See* Doc. 23-2, at 18. The proper defendant in a suit for prospective injunctive relief is any officer with some connection with the enforcement of the act sought to be enjoined. *See Ex parte Young*, 209 U.S. 123, 157 (1908) (explaining that "[t]he fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact," when identifying the proper defendant to a suit for prospective relief).

*Termination Letter*

It is undisputed that the Toledo Blade obtained Plaintiff's termination letter, signed by Ziviski, through a public records request. Thus, regardless of whether the letter would otherwise meet the elements of a due process/liberty deprivation claim, the Court finds he cannot establish the public dissemination was "voluntary." *See Hade v. City of Fremont*, 246 F. Supp. 2d 837, 846 (N.D. Ohio 2003) ("When the defendant's reasons for terminated [sic] are publicly disseminated by a requirement of law, however, the Sixth Circuit has ruled that defendants cannot be said to have voluntarily disseminated the information.") (citing *Kendall v. Bd. of Educ.*, 627 F.2d 1, 6 (6th Cir.1980)), *overruled on other grounds by Duchesne v. Williams*, 848 F.2d 1004, 1008 (6th Cir. 1988)); *see also Murtha v. Rossford Exempted Vill. Schs.*, 2021 WL 4950238, at *5 (6th Cir.) (finding that where "public dissemination of the report was required by Ohio's public records law," the element of voluntary dissemination was not met). Indeed, Plaintiff himself seemingly recognizes this. *See* Doc. 53, at 14 ("[I]t is true that the University had no choice but to share the termination letter.").[12]

<u>Blair's Statement</u>

Second, Athletic Director Blair said, and was quoted in the Blade as to Plaintiff's termination: "He's no longer employed here as of January 14, and we generally don't comment on personnel matters beyond that." (Doc. 57-21). This statement does not meet the falsity element, nor the stigmatizing element.

12. Ziviski *is* therefore entitled to summary judgment on Count V, the due process liberty deprivation claim brought against her in her individual capacity, because Plaintiff has pointed to no evidence that she was personally involved in any such deprivation

<u>Statements from Unidentified Sources</u>

This leaves the information the Blade reporter sourced from "three people familiar with the situation." (Doc. 57-21). Ultimately, this is the information Plaintiff centrally relies upon and asserts is stigmatizing. Again, the article does not identify these individuals, nor, contrary to Plaintiff's characterization, does it identify them as University employees. *See* Doc. 53, at 9 (Plaintiff's characterization that these were "unnamed University sources"). Defendants have provided evidence that they are not aware of who these individuals were. *See* Doc. 57-22, at 4-5 (interrogatory answer); (Candle Decl., Doc. 54-6, at 3); (Beck Decl., Doc. 54-3, at 3); (Burton Decl., Doc. 54-5, at 6); (Blair Decl., Doc. 54-2, at 4); (Ziviski Decl., Doc. 54-1, at 3). And Plaintiff has no personal knowledge of who spoke to the reporter, only his own assumption or speculation that it must have been someone from the athletic department or from University HR. (Doc. 37, at 183); *see also* Doc. 53, at 12 ("None of this information, especially the explanation of the alleged incident, could have come from anyone other than University sources.")

Plaintiff admits the underlying conduct that led to the University's retaliation finding. In his words:

> I said, "You know, if my wife knew you were sitting next to me, she'd want to kill you." . . . "If my wife knew how close you were sitting to me, she would want to kill you," because of all the stress and problems that obviously she had created. All right?
>
> She then responded, "I didn't want to do any of this." And I said, "HR told me you volunteered to do it." She said, "That's not true at all." And I said, "That's what they told me." And she stormed out of the room.

(Doc. 37, at 154-55). He further testified that he had "something like" a couple of drinks that evening. *Id.* at 167.

The reporter wrote: "[Plaintiff] was drinking in the hospitality suite one night at the Boca Raton Marriott at Boca Center, sources said, when he spotted and verbally harassed a female UT

staffer who earlier in the year had reported him for allegedly making an inappropriate comment." (Doc. 57-21). But as another Circuit Court observed, "[i]n analyzing plaintiffs' claim that they were stigmatized by innuendo, we focus primarily on the evidence concerning what the city officials actually told [the reporter], not on what [the reporter] wrote." *Shands v. City of Kennett*, 993 F.2d 1337, 1348 (8th Cir. 1993). In another case applying this principle, the court found "[w]ithout 'evidence that would generate genuine questions of fact concerning the existence of defamatory statements or the source of any such statements,' [a plaintiff] cannot show that she was stigmatized by [an individual's] statements." *Correia v. Jones*, 943 F.3d 845, 849 (8th Cir. 2019) (internal citation omitted) (quoting *Eddings v. City of Hot Springs*, 323 F.3d 596, 601-02 (8th Cir. 2003)).

This case is distinguishable from *Hade v. City of Fremont*, 246 F. Supp. 2d 837, upon which Plaintiff relies. There, the stigmatizing information "came from interviews [two specifically identified individuals] made with the news reporter" that went beyond the substance of the termination letter. *Id*. at 846.

The Court knows only that three individuals spoke to a reporter. The Court does not know who they are, whether they were affiliated with the University, or what they said. All the Court possesses is the reporter's characterization thereof. Plaintiff cannot prove that information provided was false if he does not know what was said. When asked at his deposition what was false about the article, Plaintiff stated "the biggest inaccuracy in the article was the fact that it stated I sought out this Jane Doe and verbally harassed her." (Doc. 37, at 19-20). But again, this is the reporter's *characterization* and not a statement attributable directly to the source (even assuming the source was a University employee). *See Shands*, 993 F.2d at 1348. As in *Correia*, "[w]ithout 'evidence that would generate genuine questions of fact concerning the existence of

defamatory statements or the source of any such statements,' [a plaintiff] cannot show that she was stigmatized by [an individual's] statements." 943 F.3d at 849 (quoting *Eddings*, 323 F.3d at 601-02).

Because the Court finds Plaintiff has failed to establish a genuine dispute of material fact regarding his entitlement to a name-clearing hearing under the relevant factors, it need not reach Defendants' additional contention they properly denied Plaintiff's request for such a hearing as untimely.

Employment Discrimination Claims

Plaintiff further brings a race discrimination claim under Title VII (Count I), the same under Title VI (Count II), and an age discrimination claim under the Age Discrimination in Employment Act ("ADEA") (Count III) against the University. *See* Doc. 23-1. He further brings a § 1983 Equal Protection claim against Ziviski (Count VI). *Id.* For the reasons set forth below, the Court finds Defendants entitled to summary judgment on these claims.

***Title VII – Race Discrimination***

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e-2(a)(1).

Claims of discrimination brought under Title VII can be proven through direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012). "Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (quoting *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006)). Where direct evidence is present, the jury need not draw any inferences to conclude that prejudice against members of a protected group motivated, at least in part, a

challenged employment action. *Id.* "Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus." *Johnson v. Metro. Gov't of Nashville & Davidson Cnty*, 502 F. App'x 523, 534 (6th Cir. 2012) Where there is no direct evidence and instead only circumstantial, a plaintiff's claim is analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Under *McDonnell Douglas*, the burden resides first with the plaintiff to show a prima facie case of race discrimination. *Id.* If the plaintiff successfully proves their prima facie case, the burden then shifts to the employer to provide a "legitimate, non-discriminatory explanation for its actions." *Id.* If the employer provides such explanation, the burden then shifts back to the plaintiff to show pretext, meaning the employer's explanation was merely fabricated to hide an illegal motive. *Id.*

Plaintiff does not argue he has direct evidence of discrimination, but instead contends he can succeed in demonstrating a question of fact regarding pretext or meet his burden under a mixed-motive theory. *See* Doc. 57, at 21-32. The Court therefore proceeds through the *McDonnell Douglas* burden shifting analysis, viewing the facts in the light most favorable to Plaintiff.

<u>Prima Facie Case</u>

To establish a *prima facie* case of discrimination under Title VII, Plaintiff must show he: (1) is a member of a protected group; (2) was subjected to an adverse employment decision; (3) was qualified for the position; and (4) was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably. *See Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021).[13] Defendant concedes Plaintiff meets the first

13. Plaintiff only argues replacement, not less favorable treatment. *See* Doc. 57, at 23-24.

three prongs, but attacks his ability to demonstrate a question of fact regarding his alleged replacement by a similarly-situated employee outside the protected class. *See* Doc. 54, at 25-26.

"A person is considered replaced 'only when another employee is hired or reassigned to perform the plaintiff's duties.'" *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir. 2009) (quoting *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Conversely, "[a] person is not considered replaced when his duties are absorbed by another person 'or when the work is redistributed among other existing employees already performing related work.'" *Id.* (quoting *Barnes*, 896 F.2d at 1465); *see also Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2011) (finding the plaintiff was not "replaced" when his former workgroup was "restructured" and his "former responsibilities were distributed among existing employees").

A dispute over the plaintiff's replacement typically arises in cases involving workplace reductions in force where no new individual is hired. Here, Defendants point to evidence that Plaintiff was originally hired as "Assistant Head Coach," "Co-Defensive Coordinator," and "Defensive Line Coach." (Candle Decl., Doc. 54-6, at 1-2).[14] In his role as Assistant Head Coach, Plaintiff was expective to serve as Head Coach in that coach's absence. *Id.* at 2. As Co-Defensive Coordinator, Plaintiff "was responsible for helping coordinate the defense by creating play calls, along with Co-Defensive Coordinator Vince Kehres." *Id.* Finally, in his role as Defensive Line Coach, Plaintiff "was responsible for the oversight of the defensive line,

14. "Defensive Line Coach" was called "Outside Linebackers Coach" at the time of Plaintiff's hire but renamed during Plaintiff's tenure; the job duties remained the same. (Candle Decl., Doc. 54-6, at 2).

including preparing and coaching students, as well monitoring student academics and being a mentor for the defensive line players." *Id.*

As recounted above, following Plaintiff's termination, Head Coach Candle avers he did not hire a direct replacement for Plaintiff, but rather reorganized the football staff responsibilities more broadly. *See id.* at 1-2. Specifically, he contends he did not hire Knight as a replacement for Plaintiff. *Id.* at 3. This is so, he contends, because "Knight was solely responsible for coaching the defensive line" and "did not perform the duties or hold the titles of Assistant Head Coach or Co-Defensive Coordinator." *Id.* at 3. Knight was also paid less than Plaintiff -- $110,000 to $162,786. *See id.* at 3; Candle Depo., Doc. 39, at 22. Plaintiff asserts in his opposition brief that although he had several job titles, he "primarily coached the defensive line as that was his 'position group.'" (Doc. 57, at 23). However, the citation Plaintiff provides for this assertion does not reflect a discussion of Plaintiff's job duties in any way and does not support such a statement. *See id.* (citing Plaintiff Depo., Doc. 37, at 75:1-21).[15] Thus, Plaintiff has not presented evidence that Knight took over his primary duties based on this citation.

The facts of this case, however, do not fit neatly into a reduction-in-force type scenario where a terminated individual's duties are entirely distributed among existing employees. Here, it is undisputed that some of Plaintiff's duties were absorbed by existing employees and some were given to Knight. The Court finds Plaintiff has at least established a question of fact regarding whether he was replaced by Knight. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 532 (6th Cir. 2014) (reversing grant of summary judgment because the court found "evidence in the record to establish a genuine factual dispute regarding whether [the plaintiff's] position was eliminated or whether he was replaced by a younger individual"); *Thompson v.*

15. Indeed, the quoted words "position group" do not appear anywhere in Plaintiff's deposition. *See* Doc. 37.

*UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 624 (6th Cir. 2010) (finding questions of fact existed as to whether two positions were substantially similar such that the new employee replaced the plaintiff where the new employee had somewhat different responsibilities than the terminated employee but where, regardless of the employees' titles, they were positioned similarly within the hierarchy of the workplace).

Legitimate Nondiscriminatory Reason

Assuming Plaintiff can establish a *prima facie* case, the burden of production shifts to Defendants to articulate a legitimate nondiscriminatory reason for their actions. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "[Defendant's] burden is merely one of production, not persuasion." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). The reason must be "clear and reasonably specific" and supported by "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257-58.

Defendants have done so here.[16] They cite the University's discrimination and retaliation investigations and the investigative determination that Plaintiff had violated the University's non-retaliation policy. *See* Doc. 53-2 (Report of Investigation). Defendants further cite Plaintiff's non-dispute of the underlying conduct upon which the University relied. *See* Doc. 54, at 27-28.

This is a legitimate nondiscriminatory reason. *See, e.g.*, *Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012) (finding violation of company policy a legitimate nondiscriminatory reason for termination)

16. Plaintiff does not expressly dispute that Defendants have done so. *See* Doc. 57, at 25 (arguing Plaintiff has met his burden to establish a prima facie case and then continuing to argue pretext: "[e]ven if the University were able to carry its burden to state a legitimate, nondiscriminatory reason for termination, the burden shifts back to [Plaintiff] to show pretext").

Pretext

Pretext may be shown "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) (quoting *Burdine*, 450 U.S. at 256)). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400. "To carry [his] burden in opposing summary judgment, [a plaintiff] must produce sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [him]." *Id.*; *accord Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014).

"An employer can defeat a pretext argument if it can show that it 'honestly believed' its proffered reason." *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 552 (6th Cir. 2025) (citing *Clay v. U.S. Parcel Serv.*, 501 F.3d 695, 713-14 (6th Cir. 2007)); *cf. Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 394 (6th Cir. 2026) ("[A]n employer who fires an employee for fraud does not need to establish that the employee committed the fraud—just that it honestly believed the employee did so."). An honest belief is one formed in "*reasonable* reliance on the particularized facts that were before it at the time the decision was made." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)) (emphasis added). The Sixth Circuit does not, however, "require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id.*

Defendant asserts its investigation, combined with Plaintiff's admitted actions, is sufficient to demonstrate its reasons were based in fact and actually motivated its termination of

Plaintiff. (Doc. 54, at 28-29). And it further contends Plaintiff cannot show that his race was the motivating factor in his termination, let alone the primary or sole reason. (Doc. 54, at 29-30; Doc. 61, at 4-6, 8-10)

Plaintiff presents two arguments in response. First, he contends he can demonstrate "the proffered reason is unworthy of credence." (Doc. 57, at 25). Within this argument he attacks the investigation as "baseless" and the retaliation complaint as "unfounded," asserts additional evidence demonstrates race was the primary motivating factor in his termination, and contends that Defendants cannot rely on the honest belief doctrine because the decision was not reasonably informed. (Doc. 57, at 25-29). Second, Plaintiff argues he can also meet his burden under a mixed-motive theory. *Id.* at 29-32.

*Unworthy of Credence*

First, Plaintiff contends that the original investigation regarding discrimination and harassment (the "fancy pants" comment) was "baseless" and "should have never resulted in an investigation in the first place." (Doc. 57, at 25). He emphasizes UT ultimately found he did not violate the Non-discrimination Policy. *See* Doc. 57-15. This latter statement is accurate. *See id.* at 21 (finding no violation of the Nondiscrimination Policy). However, Plaintiff was ultimately terminated for violation of the Non-retaliation Policy, not the Nondiscrimination Policy, and so this argument does not show the "proffered reasons did not actually motivate the employer's action." *Chen*, 580 F.3d at 400. Further, the Court does not "sit as a 'super-personnel department,' second-guessing management decisions," such as when to initiate an investigation of University policy. *Hardesty v. Kroger Co.*, 758 F. App'x 490, 496 (6th Cir. 2019) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 960 (8th Cir. 1995)); *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 848 (6th Cir. 2015) (explaining that, in determining whether pretext exists, it

is not the court's role to "act as a super personnel department that second guesses employers' business judgment") (quoting *Corell v. CSX Transp., Inc.*, 378 f. App'x 496, 505 (6th Cir. 2010)); *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) ("Although Plaintiff contests the validity of at least two of [his] disciplines [that form the basis of the termination decision], this dispute is immaterial because it does not undermine [the employer's] well-founded belief in the particularized facts that were set forth in the Summary of Investigation at the time Plaintiff was fired."); *see also Siefert v. Liberty Twp.*, 2024 WL 4100897, at *2 n.3 (6th Cir.) ("To evaluate whether the [employer's] justifications for [the plaintiff's] termination have a basis in fact, 'we simply inquire whether the proffered bases for h[is] discharge actually happened.'") (quoting *Santiago v. Meyer Tool Inc.*, 2023 WL 3886405, at *5 (6th Cir.)). And "disputes about the interpretation of company policy do not typically create genuine issues of material fact regarding whether a company's stated reason for an adverse employment action is only a pretext designed to mask unlawful discrimination." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558-59 (6th Cir. 2009).

Additionally, Plaintiff argues it was "simply impossible" for him to have retaliated against Jane Doe because he "had no authority to issue any disciplinary or other 'adverse action' against [her]." (Doc. 57, at 26).[17] And Latta testified she concluded there was "sufficient information to find that . . . his conduct was retaliatory" based on Plaintiff "approaching [Jane

---

17. As noted above, although the Non-retaliation Policy itself does not define "adverse action", the Nondiscrimination Policy includes a description of "adverse action" within its definition of retaliation:

> *Retaliation*: Adverse action taken against an individual because the individual has engaged in a protected activity (such as filing a discrimination complaint or participating in an investigation of a violation of law or policy). The adverse action can be tangible (such as the giving of a lower grade or unjustified discipline) or intangible (such as the making of verbal threats).

(Doc. 54-5, at 10).

Doe], going up to her, creating an environment where she no longer felt comfortable being around him" based on "the totality of the circumstances." (Latta Depo., Doc. 43, at 43-44). And again, it is not this Court's role to "sit as a 'super-personnel department.'" *Hardesty*, 758 F. App'x at 496 (quoting *Krenik*, 47 F.3d at 960).

Here, UT conducted an investigation in which it interviewed several witnesses to the underlying conversation, as well as Plaintiff himself. Plaintiff admits he spoke to Jane Doe about why she had pursued a claim against him. *See* Plaintiff Depo., Doc. 37, at 169 ("Q: And after you made the comment and she replied, why did you feel the need to inquire with her about whether she had meant to pursue the first complaint? A: Because I felt that she had been lying the whole time."). An honest belief is one formed in "*reasonable* reliance on the particularized facts that were before it at the time the decision was made.'" *Wright*, 455 F.3d at 708 (quoting *Smith*, 155 F.3d at 806) (emphasis added). Plaintiff has not presented evidence to create a genuine dispute of material fact regarding UT's "honest belief" in its reasons for terminating him and thus cannot show pretext in this way.[18]

*Race as Motivating Factor*

Next, as another way to show pretext, Plaintiff contends he has evidence that "demonstrates that race was the primary motivating factor in his termination." (Doc. 57, at 27).

---

18. The Court finds this case distinguishable from *Shazor*, 744 F.3d at 960-61, upon which Plaintiff relies. In *Shazor*, the court found that an investigation involving a single interview was not enough to support an "honest belief" that an individual had lied with intent to deceive. *See id.* at 961 ("One conversation did not establish sufficient particularized facts about the truth behind Plaintiff's statements, let alone her motive. Defendants have therefore failed to establish a foundation for the honest belief doctrine to apply."). By contrast, the interaction here was witnessed by several individuals interviewed for the investigation. *See Rodriguez v. City of Galion*, 2025 WL 1756907, at *16 (N.D. Ohio) ("Gathering witness statements and making a reasonable assessment of the available evidence as part of your investigation prior to terminating an employee is sufficient process, '[t]he law does not require the [employer] to do anything more.'") (quoting *Loyd v. Saint Joseph Murcy Oakland*, 766 F.3d 580, 592 (6th Cir. 2014)).

First, Plaintiff points to UT's broader DEI initiatives. *Id.* But Plaintiff points to no concrete evidence beyond his own speculation connecting these broader initiatives to the termination of his employment. *See, e.g.*, *Barnes v. 3M Co. Inc.*, 2025 WL 794453, at *10 (N.D. Ala.) ("Barnes highlights no caselaw indicating that seeking a legal opinion before terminating an employee, having a DEI program, or *mentioning* workforce diversity in an end-of-year summary is in any way unlawful or relevant to the question of pretext."); *Vaughn v. CBS Broad., Inc.*, 2026 WL 1298066, at *7 (C.D. Cal.) ("Stated differently, CBS's promotion of diversity in the interview process is insufficient to create a disputed issue of fact showing that Vaughn's termination was a mere pretext for anti-white racial discrimination.")

Second, Plaintiff points to a comment he asserts was made by Athletic Director Blair regarding "his intent to make the coaching staffs more 'representative' of the student-athlete population." (Doc. 57, at 27). For this proposition, Plaintiff cites his own deposition. *Id.* (citing Doc. 37, at 231:1-7). In the cited section, Plaintiff is quoting his EEOC complaint, wherein he wrote:

> Indeed, in the summer of 2022, at a . . . department-wide staff meeting, in which the new athletic director, Bryan Blair, introduced his new assistant athletic director, Al Tomlison, who is under 40 and black. He then announced the intention of [the] athletic department to hire more coaches who were representative of our current student athletes.

(Doc. 37, at 231). Tomlinson replaced an older, Caucasian male employee who retired. (Doc. 57-8, at 5). In his opposition brief, Plaintiff asserts that "rather than clarify[ing] his intentions regarding the racial makeup of the coaching staff, Mr. Blair evaded nearly every single question relating to diversity and did not deny making the 'representative' comment" in his deposition. (Doc. 57, at 27). In his deposition, Blair testified:

> Q: Okay. In your view, how important is diversity as a consideration in the athletic department's hiring decisions?

A: I don't have an opinion.

Q: Okay. Should it play any role?

A: I don't have an opinion.

* * *

Q: Okay. Have you ever considered diversity in hiring decisions?

A: I don't have an opinion.

Q: I'm not asking your opinion, Mr. Blair. I'm just asking if you have ever considered it?

A: No.

* * *

Q: Okay. During any of these meetings, did you mention that it was the intent of the athletic department to hire more coaches who were representative of student athletes?

A: No. I don't recall that.

* * *

Q: Do you think - - do you think it's important to increase opportunities for historically underrepresented groups in coaching staff in the athletic department?

A: I don't have an opinion.

* * *

Q: Do you agree with the statement that diversity is a core value of The University of Toledo?

A: I don't have an opinion.

Q: Do you think that diversity is essential to the university's ability to survive and thrive?

A: I don't have an opinion.

(Doc. 41, at 18-19, 24, 64, 73) (objections omitted). As Defendants point out, Blair testified Plaintiff himself was "representative" of student athletes:

Q: Are you aware that Mr. Kuligowski played football at the University of Toledo?

> A: Yes.
>
> Q: As a former student athlete, would you consider Mr. Kuligowski to be representative of current student athletes?
>
> A: Yes.

(Doc. 41, at 24-25).

When examining statements that allegedly reflect bias, courts consider, in the totality of the circumstances, four factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). Statements that "are 'general, vague, or ambiguous comments' . . . fall short of establishing animus." *Duncan v. Sam's Club*, 2022 WL 17489104, at *3 (6th Cir.) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708-09 (6th Cir. 2008)).

Regardless, even taking as true that Blair made such a statement (as the Court must at this stage), and even assuming Plaintiff's interpretation thereof is correct (that Blair wanted to hire more younger Black coaches), the statement was not "related to the decision-making process" of Plaintiff's firing in any way, was not "proximate in time to the act of termination" (having been made seven months earlier), *Peters*, 285 F.3d at 478, and amounts to nothing more than the sort of "'general, vague, or ambiguous comment[]' that fall[s] short of establishing animus," *Duncan*, 2022 WL 17489104, at *3 (quoting *Daugherty*, 544 F.3d at 708-09). Additionally, the record reflects that Candle, not Blair, had sole authority over hiring football coaches. The Court finds Blair's "representative" comment insufficient to establish a question of fact regarding pretext. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 55051 (6th Cir. 2004)

("Statements by non-decision makers, *or statements by decision makers unrelated to the decisional process itself* can not suffice to satisfy the plaintiff's burden' of demonstrating animus.") (emphasis added) (citation modified).

Because Plaintiff has not demonstrated Defendants' nondiscriminatory reason for his termination is unworthy of credence nor that race was the motivating factor in his termination, the Court finds Plaintiff has not demonstrated a question of fact regarding pretext.

Mixed-Motive

Plaintiff also argues he can succeed on a mixed motive theory because a reasonable jury could find that race was *a* motivating factor in the decision to terminate his employment. (Doc. 57, at 29-32). He again points to the University's DEI initiatives and Blair's "representative" statement. Defendants respond that these statements are simply not sufficient to create a genuine issue of material fact. *See id.*[19]

"A mixed-motive analysis applies to cases 'where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives.'" *Ondricko*, 689 F.3d at 649 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003)). "At the

19. Defendants first argue "Plaintiff did not even plead a mixed motive theory enough to give Defendants notice." (Doc. 61, at 9). But the Sixth Circuit has held that arguing a mixed-motive theory in response to summary judgment is permissible. *See Ondricko*, 689 F.3d at 649 ("Ondricko gave adequate notice of mixed-motive claims in her response to MGM's motion for summary judgment."). Indeed, although Defendants cite *Sprees v. James Marine Inc*, 617 F.3d 380, 390 (6th Cir. 2010) for the proposition that the "record cannot be utterly silent as to mixed motives," (Doc. 61, at 9), *Sprees* itself cited *Hashem-Younes v. Danou Enters. Inc.*, 311 F. App'x 777, 779 (6th Cir. 2009), as an example of the Sixth Circuit "affirming the district court's application of the *McDonnell Douglas/Burdine* framework where the plaintiff failed to raise a mixed-motive claim in her complaint *or in her response to the defendants' summary judgment motion*, and the record was 'utterly silent as to mixed motives.'" *Sprees*, 617 F.3d at 390 (emphasis added); *see also Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 435-36 (6th Cir. 2012). Plaintiff has clearly presented such a theory here in his summary judgment opposition brief and thus it is properly before the Court.

summary judgment stage, the ultimate question is whether [the plaintiff] presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that [his] race . . . [was a] motivating factor[] in [the] decision to terminate [his] employment." *Id.* "Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998). "In determining whether discriminatory comments are circumstantial evidence of discrimination in a particular case, [courts] consider factors such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012).

To support his mixed motive argument, Plaintiff cites the same evidence he asserts demonstrates pretext above – the University's DEI initiatives and Blair's "representative" comment. *See* Doc. 57, at 29-32. But evidence or statements "are sufficient evidence of racial animus only if they have some connection to the decision to terminate [Plaintiff]." *Griffin*, 689 F.3d at 595. As explained above in relation to pretext, facts supporting that connection are lacking here. Broad DEI statements and a singular comment about hiring "representative" individuals are too general and vague to demonstrate an issue of material fact regarding whether race was a motivating factor in Plaintiff's termination.

As such, the Court finds Plaintiff has failed to demonstrate a material factual dispute, and UT is entitled to summary judgment on Plaintiff's Title VII race discrimination claim.[20]

20. Ziviski is similarly entitled to summary judgment on Plaintiff's § 1983 equal protection claim (Doc. 23-2, at 20) (Count VI). *See Sutherland v. Mich. Dep't of Treasur*y, 344 F.3d 603, 614 (6th Cir. 2003) (explaining discrimination claims under the brought Equal Protection Clause under § 1983 are also analyzed using the Title VII framework). Additionally, because Plaintiff has not established a question of fact regarding a constitutional violation, the Court need not

***Title VI***

Plaintiff also brings a claim of race discrimination in violation of Title VI against UT. (Doc. 23-2, at 13-14). UT asserts it is entitled to summary judgment on such a claim because Plaintiff has not presented evidence that it receives federal financial assistance for the purpose of providing employment. (Doc. 54, at 31). Alternatively, Defendants assert that Plaintiff's Title VI claim fails for the same reason his Title VII claim fails. *Id.*

"Title VI prohibits any 'program or activity receiving Federal financial assistance' from discriminating against any person 'on the ground of race, color, or national origin.'" *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 (6th Cir. 2021) (quoting 42 U.S.C. § 2000d). "Title VI does not provide a judicial remedy for employment discrimination unless providing employment is a primary objective of the federal aid; or unless that discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Stewart v. Simpson Cnty. Bd. of Educ.*, 871 F.2d 1089 (6th Cir. 1989) (table). The Sixth Circuit has "assume[d] without deciding" that the *McDonnell Douglas* burden-shifting framework governs Title VI claims. *Johnson v. City of Clarksville*, 186 F. App'x 592, 594-95 (6th Cir. 2006) (citing *Paasewe v. Ohio Arts Council*, 74 F. App'x 505, 508 (6th Cir. 2003)).

For the same reasons stated above with respect to Plaintiff's Title VII racial discrimination claim, the Court grants Defendants summary judgment on Plaintiff's Title VI racial discrimination claim and finds it unnecessary to resolve the dispute regarding whether Plaintiff has presented sufficient evidence of federal funding.

---

reach Defendants' additional argument that any claim for declaratory or injunctive relief is barred by sovereign immunity.

***ADEA***

Plaintiff also brings an age discrimination claim under the Age Discrimination in Employment Act ("ADEA"). (Doc. 23-2, at 14-16). UT argues it is entitled to summary judgment on this claim because Ohio has not waived sovereign immunity as to such a claim. (Doc. 54, at 31-32). Plaintiff responds that UT "has waived its sovereign immunity through its active participation in this litigation." (Doc. 57, at 33). The Court disagrees and finds Defendants entitled to summary judgment on the ADEA claim.

The ADEA did not abrogate the states' sovereign immunity. *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 66 (2000). And Ohio has not consented to suit in federal court under the ADEA. *Latham v. Office of Atty Gen.*, 395 F.3d 261, 270 (6th Cir. 2005).

"A state may waive its sovereign immunity through litigation conduct, but its intent to do so must be 'clear.'" *Kerchen v. Univ. of Mich.*, 100 F.4th 751, 762 (6th Cir. 2024) (quoting *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002)).

Defendants raised Eleventh Amendment/sovereign immunity in their Answer to Plaintiff's original Complaint (Doc. 9, at 40), and in their Answer to Plaintiff's Amended Complaint (Doc. 31, at 39). The Court will not find waiver here. *See, e.g.*, *Barachkov v. Davis*, 580 F. App'x 288, 300 (6th Cir. 2014) (finding no waiver occurred where a state entity raised the immunity defense in its answer to the complaint, but did not file a Rule 12(b)(1) motion to dismiss on sovereign immunity grounds or assert its sovereign immunity defense until its summary judgment reply brief); *Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 683 (6th Cir. 2018) (county did not waive sovereign immunity by failing to fully develop the argument it was an arm of the State in its combined motion to dismiss/motion for summary

judgment when it nonetheless "undeniably invoked its sovereign immunity in [that] initial motion").

Defendants are therefore entitled to summary judgment on Plaintiff's ADEA claim.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiff's Motion for Summary Judgment on Count IV (Doc. 53) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. 54), be and the same hereby is, GRANTED.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: September 14, 2026